et al. to exceed 15 minutes per side. Can you shoot one out? Counsel, before we start, let's just talk a little bit, since we have two cases, one right after the other, that are somewhat related. We're going to go through them individually, although the facts are obviously interrelated, and I think you should be aware that we're pretty familiar with the facts. You can obviously emphasize whichever ones you would like, but we'll call the first case. We won't make you change tables for the second case, but obviously there's some connection between the two, but let's try to argue them as we go along. Yes, I recognize that. And do you have a time breakdown for that case? We do. I'm going to take 12 minutes of that on behalf of the majority of the appellees in that case. Okay, that's helpful. Okay, thank you. We can proceed then. Thank you. May it please the court opposing counsel, my name is Scott Sheets on behalf of the Franklin County Prosecutor's Office, and I'm here today on behalf of defendants Seth Nibert and Randall Hoar. The trial court properly granted summary judgment to deputies Nibert and Hoar on all claims, except for those related to Mr. Peterson's death on the evening of September 3, 2011 into the morning of September 4, 2011. The trial court erred in denying summary judgment as to those claims for one. Counsel, I know you can speak that fast, but I can't listen that fast. Sure, I'll try to calm down. I saw no evidence in there. Let me phrase it another way. Was there any evidence in there that these jail conditions caused this death? Absolutely not, Your Honor. Were you agreed on that or is that an issue? I can't speak for appellees in this case. I can tell you that Mr. Peterson died from congestive heart failure. The cause of death was never challenged as far as the medical cause of death. That was unknown to anyone. That's never been disputed. The trial court erred in this case in denying summary judgment to deputies Nibert and Hoar for one simple reason. This court, when it comes to Eighth Amendment claims premised on deliberate indifference, requires actual knowledge of a serious risk to a detainee's health or safety. There is no evidence at all that Deputy Nibert or Deputy Hoar knew anything was wrong with Mr. Peterson on the evening of September 3 into the morning of September 4. For the purposes of this appeal, we have conceded that Mr. Peterson was suffering obvious symptoms. Mr. Peterson was dying from a sudden cardiac event. I think this court can sort of understand that anyone that's dying from something like that is going to exhibit obvious symptoms. However, obvious symptoms are not enough. The fact that these defendants could have noticed something was wrong with Mr. Peterson or even that they should have noticed something was wrong with Mr. Peterson does not speak to deliberate indifference. It at most speaks to negligence. How does the medical staff that they had play into this? What kind of arrangement did they have? They talk about psychiatrists. They talk about nurses. What was their arrangement with the jail? Their arrangement is that the medical staff is completely divided from the correctional staff. That's standard practice for a lot of bigger jails, as I'm sure this court knows. There's a straight delineation. Medical staff handles all medical care, requests, treatment, diagnosis, setting people up for physicals, everything. The deputies handle security and corrections, distributing meals, things like that. There's no dispute over that. Did any of them recognize the guy who had congestive heart failure? No, Your Honor. Mr. Peterson never reported the physical condition. The medical staff, who as we note in our briefs, and this is sort of germane to the other case I guess too, but the medical staff, as we noted in our brief, had over a dozen contacts with him. About once every two and a half days he was seen by a nurse or a doctor. Two different nurses, three different doctors. None of them ever once noted, observed, called for treatment, anything related to a physical health condition. I will say for clarity, there is one defendant, his name is Doug Hahn, who interacted with Mr. Peterson during intake and throughout his stay at the jail, who did at one point become aware that Mr. Peterson had hypertension, high blood pressure, but there's evidence in the record that Mr. Hahn informed the nursing staff of that twice, and hypertension is not congestive heart failure. That's not what killed Mr. Peterson. The way the case is being argued, as I understand it, is you have this Dr. Shu, is that his name? I'm sorry? You have a doctor. Suna. Dr. Suna basically says that he became critical from about 3.30 to the time he died in the morning, something like that. And describes what a person, had they observed the decedent, would have presumably noticed. Your defendants say that they saw him during that time period. And essentially the doctor seems to be saying that anybody that saw him during that period would have noticed that. So we've got that on the one side. Your guys say they looked at him, they didn't know anything. The fact that a jailer says, I didn't know, is not ultimately dispositive of that if there's other evidence. So it seems to come down to the doctor saying, had they actually done what they said they did, they surely would have noticed that. Now why is that not enough? That's not enough, Your Honor, because in cases before this court like Rouster and Jones, which we're pointing out in our briefs, there's a lot of evidence of detainees or decedents close to death exhibiting horrible, obvious symptoms. But this court has still found that the particular defendants weren't deliberately indifferent because they either weren't aware of those symptoms or didn't draw an inference of any serious risk to their health or safety. I would also like to address the facts a little bit. I mean, we're conceding that Mr. Peterson had obvious symptoms on that night. However, there's... And that they were enough that he was moaning and groaning and calling for help from his fellow prisoners. For the purposes of this appeal, yes, Your Honor, we will concede that. I mean, we have to. However, there's no duty on our part to concede facts that aren't in the record. And what's not in the record is that these symptoms actually were displayed in front of my clients or that my clients actually noticed them. If I could be allowed to sort of explain the evidence. The neighboring inmates talk about Mr. Peterson calling out and moaning from about 2.30 to 4.30 in the morning. After that time, one of the neighboring inmates, I believe it's inmate Butler, even says, hey, he was quiet, we thought he was asleep. My guys don't encounter Mr. Peterson until 5.10 a.m. around there for Deputy Nybert and around 7.30 a.m. for Deputy Hoar. So in the case of Deputy Hoar, he's not even at the facility when the moaning and groaning and the obvious symptoms are going on. In the case of Deputy Nybert, his testimony that he encountered Mr. Peterson at around 5.10 a.m. and thought nothing was wrong is entirely consistent with all the other evidence in the case. And so, yes, he was exhibiting obvious symptoms, Mr. Peterson, but there's no evidence that he was exhibiting them in front of my clients or that my clients noticed. The other side attacks the credibility, which is based on, now we're getting over to the other appeal, but they are related. Saying that the internal affairs investigation showed a lot of neglect on pretty much everybody's part in there. And the trial judge, as I understood his opinion, said, well, that's circumstantial evidence that your guys shouldn't be believed when they say they didn't hear him moaning or all that they saw was what they said they saw. Do you want to comment on that? Well, yes, I do. I mean, my view is this. Rule 56 says point out evidence in the record, proper evidence that sustains your burden, that there's no disputed issue effect. That's what the defendants did. In response, I don't think the plaintiff just gets to say, liar, liar. They're lying. Don't believe them. You know, the fact that these deputies lied about two head counts, and let me clear that up. They lied about their head counts. That was admitted in their answers at the inception of the litigation. We've never hid from that fact at all. Despite admitting that in the answer, despite two dozen depositions, hundreds of interrogatories, a year's worth of discovery, there's been no evidence at all that these deputies lied about their interactions with Mr. Peters in that morning. So I think it's a red herring. I don't even know if it's something they could use to impeach these defendants. But I don't think you get to say, here's all this evidence that exonerates these guys, but they lied about something else, so don't believe anything they say. I think that plaintiff's burden was to point out actual evidence of knowledge. And I've invited, I sort of asked rhetorically before the trial court and this court, and I would invite plaintiffs today, where is the actual evidence? Where is there any testimony, any video, any document, anything that says my clients were present when Mr. Peterson was exhibiting symptoms? The inmate affidavit. He first said he had obvious symptoms. If they were obvious, then they were persistent, like his feet being swelled up to three times normal size and that sort of thing. You can't say that they were obvious, but they weren't obvious to your people. I mean, the moaning and groaning, we can argue about that, although so we either have to believe one side or the other. But in terms of the degree of his edema, the degree of the distortion of his body and that sort of thing, isn't that what you meant by obvious symptoms? Yes, Your Honor, and in that regard, I'd ask the court to look at Dr. Suna's testimony where he says, hey, if somebody's wearing pants, you might not notice their swollen legs, or if they're short of breath, you might not notice that they were breathing unless they made a complaint. But I would say with this obviousness issue, obviousness is not enough. Obviousness in a lot of these cases is sort of talked about in terms of the objective and subjective element of deliberate indifference, and there's sometimes in the cases, not a conflation, but they're not really broken down to say what obvious goes to objective or obvious. There are some cases when we say Stephen V. Olson is an unpublished case, and I had another hard case where you say that we have said or we've upheld district courts that have said something was so obvious that that is evidence that it actually registered. Is that a fair statement of some cases? Not from the cases I read, Your Honor, and not from more recent cases that are reported like Rouster and Jones where it says, hey, you have to be actually aware of the problem with this person. If you look at Rouster and Jones. The question is what kind of evidence shows actual awareness? Do you have to have a statement where the person says, oh, I looked at him and I saw that his arm was falling off? No. I mean, that would certainly be enough, I think, Your Honor, but I think you need something else. I mean, you've got a detailed inmate affidavit that says here's all these things that happened on this night but doesn't identify these defendants, doesn't identify any deputies as having been present when these symptoms were going on. There's no evidence that these deputies were told about the symptoms, that Mr. Peterson reported them. I'd also ask the court to consider this in terms of the obviousness. Mr. Peterson wasn't in an isolation cell because of his heart problems. This isn't a case, you know, where someone's on a suicide watch and the deputies know they have to keep checking on this person or there's some reason to look in on them. This guy was in an isolation cell for 28-some days before the day he died. These deputies encounter him for just seconds or a minute at most on the night he dies. They have no reason at all to suspect that he's going to say. In the three days before he died, how many times would they have seen him? I'm sorry? Just picking a number that's sort of at random. In the three days, let's say, before he died, how often would these? These two? Yeah, these. They didn't work. There were different deputies on different shifts. So there was Deputy Hoar, I believe, worked one day previous to that and Deputy Nybrok one shift, but I'm not certain on that. But I do know that, for instance, Deputy Benson worked September 3rd. Deputy Neely worked September 3rd. So there were different deputies, some of the defendants in the 4151 appeal that worked at different times. So Deputy Hoar and Deputy Nybrok weren't working every day around Mr. Peterson in the three days before he died to sort of directly answer your question. We've talked a lot about obviousness. I would just say it can't be enough. It cannot be enough on its own. If you say every time that someone has obvious symptoms, there's an issue of fact as to knowledge, you're basically turning a deliberate indifference standard into negligence. They had obvious symptoms. You should have noticed. You could have noticed. No evidence that you did, but you should have or could have because they were so obvious. So there's an issue of fact as to deliberate indifference. I don't think that's the law. I think in the cases with obviousness, such as Smith v. Lenowee in the Jimenez District Court case cited by the District Court in this case, there's a lot of other evidence. You're talking about detainees that come into jail extremely sick. They die within days from rapidly progressing symptoms. There's evidence on the record in those cases where the deputies or the corrections officers admit, yeah, I knew this guy was sick. I knew they had DTs. I knew they were shaking. So in the case of Smith, for instance, there's a Sergeant Craig in that case, which this court said it was a close call for Sergeant Craig on qualified immunity. There was a video in that case showing Sergeant Craig entering the cell while the decedent in that case was twitching and laying on the floor. None of that is present here. All we know is that the night Mr. Peterson died, like when a lot of people died, he was in distress and that these deputies worked that night and encountered him. That is not enough to find deliberate indifference. I'd like to address one more thing. We've talked a lot about obviousness, but the proximate cause issue. In trying to pin the responsibility of Mr. Peterson's death on these two deputies, the plaintiffs have a burden to present evidence of proximate cause. Here's the actions they took. Here's the actions they didn't take. Here's how those affected Mr. Peterson's chance of survival. Here's how he could have survived. Their expert was unable to do that. Defendants say in their brief, well, he didn't name names. We asked him a ton of questions about who's responsible for what. He couldn't delineate between medical staff and deputies. He couldn't pinpoint any specific person's actions to a specific day. He couldn't say any action that somebody should have taken that would have saved Mr. Peterson's life. He didn't even say Mr. Peterson's life likely could have been saved. I think that's also fatal to the claims. I don't understand that. Suna testified that if his condition had been notified by prison officials and appropriately relayed to medical staff at the onset of his dramatic change around 3.30 a.m. or over the next four and a half to five and a half hours, he could have been successfully treated and he could have survived. You're right, Your Honor. When I asked him about deposition, I said, is that likely or could? He said, well, could. I can't put a percentage on it. I said, well, paraphrasing, but basically whose actions or he couldn't identify anybody's actions as bearing on that. You can't just say, well, he was dying from 3.30 to 7.30. But if he's focusing on 3.30, these two guys are the only ones who were around or that we have evidence, as I understand it, and that's probably the reason the district judge sliced it the way that he did. That is, Suna, as Judge McKeague just read, doesn't just say he's been sick for a month, you should have saved him. He at least says exactly that. And then your proportion question kind of goes to the weight of the evidence of proximate cause, doesn't it? I don't think so, Judge. I think your first statement that he said, yeah, I've got a 30-day window, as he said, we're talking about a 30-day progression. But that's not what Judge McKeague said. That's not what it says with that particular statement, but he doesn't identify anyone as having a chance to intervene. I mean, he doesn't say 5.10 a.m. Deputy Nybert. He doesn't know about the deputies. He knows about the medicines. He's the doctor. So he says during this four-and-a-half-hour period, if anybody had noticed, he could have been saved. Why does he then have to say, and therefore these guys were around his cell at that time so they could have saved him? That's not his role in the trial. He's a doctor. Well, I mean, I think they have to put verifying medical evidence in the record that says here's the inactions or actions that either didn't take place or should have taken place that would have changed the outcome. And I don't think they just get to say, well, something should have been different this night. I mean, is he talking about Deputy Nybert at 5.10 who sees Mr. Peterson awake and converses with him, or is he talking about Deputy Hoar who sees him asleep and probably dead at 7.30? I mean, that's a distinguishing thing there that I think matters. Thank you, counsel. Thank you for your time. Thank you. Good morning, Your Honors. Joe Russell here today representing the plaintiffs' appellees in this matter. I think a lot of the questions and discussion that's been going on centers at the crux of this matter, is that there are questions of fact everywhere here. There are questions of fact as to what Deputies Nybert and Hoar saw on the morning of his death, and there are questions of fact about whether Mr. Peterson ultimately could have been saved if they had summoned medical attention for him. What evidence is there that they saw this man under conditions they should have known he was in surgery? Sure, and that's where we get into the difference between circumstantial and direct evidence, the value of the evidence in weighing it. What we know is that they did see Mr. Peterson on the morning he died. One, I think, at 2.30, 3 o'clock a.m., and the other one at 5.30 when he asked the man if he wanted his breakfast tray, and he said yes. That's correct, Your Honor. Well, that's what their account of the events is. Yeah, but there isn't any other evidence in their account. Well, there'd be if every time a Deputy said, well, I didn't notice these obvious symptoms in a self-serving manner, essentially they'd be admitting to deliberate indifference that we didn't do anything. Well, let me ask you as I take it, these guys aren't doctors. That's correct, Your Honor. They're not registered nurses. Correct, Your Honor. Over a period of 30 days, three psychiatrists, I think it was, and I don't know how many nurses, but they saw this man. The nurses saw him three times a week. The doctors, I think, saw him among the three of them 13 times, I think, I figured out yesterday. So if these guys, these people highly learned in the medical profession, didn't recognize that he had congestive heart failure, how do you expect these two guys who are basically PFCs or corporals, using Army terms, to recognize it? I would answer that question in two ways, Your Honor. The first way I would answer it is to say that, obviously, we are very critical of the medical professionals who saw him, and the expert testimony in this case from both sides, and that goes into the other part of the case, right, in terms of whether the county might be held liable for the actions of the third-party medical contractors. But more relevant to this case, if we talk about the, we're talking about a failure to diagnose instead of a failure to note critical and key medical symptoms, okay? So we're not claiming that Deputies Nybert and Hoare had any responsibility to diagnose Mr. Peterson, but I think, like the district court said, at that point in time, he was in this acute state where he's moaning, struggling to breathe, his feet are swollen up to three times their normal size, his extremities are swollen, edema fluid is leaking through his feet, his cell is a total mess. You're getting a lot in there, so let's take that one step at a time. You've got the other inmates that said that he was moaning and calling out, but the way I read this, that all occurred at least a half hour, that ended at least a half hour before the first of these two deputies arrived on the scene. Is that right? Well, the timeline is kind of up in the air, but it's somewhere in that area, yes, Your Honor. Well, it's not a question of in that area. They both say that by 4.30 the calling out had stopped, and I think the first of these two deputies showed up at 5.10. I think that's correct, Your Honor. So you can't attribute to them, as far as deliberate indifference, what they didn't hear from the two cellmates, right, or the people in the cell block? Sure. I can't necessarily attribute that, no, but it does bear on the degree of struggling that he was in at that point in time. Let's assume that he was struggling. I don't see how it bears on it at all if it had stopped by the time that these two guys showed up. So we'll put that to the side. Then you say that he had gained all of this fluid. It sounds from the doctor that this occurred primarily towards the end of his life, in this about five-hour period, and it sounds like it was largely confined to his feet. Is that a fair statement? The feet and the legs, Your Honor, his lower extremities. So I don't see anything in the record that indicates that with the exchanges that apparently occurred between these two jailers that they would have Why do you say they would have or should have noticed what was going on in his legs or his feet, given that he had pants on? Sure. Well, he didn't have shoes on. He did have pants on. And the size of the feet alone is something. And another thing I'll mention. They didn't go in the cell, right? Neither of them went in a cell. They did not go inside the cell. That's correct. They looked through the window. That's correct. And in the video that has been, the CDs that have been submitted, it's very hard to see anything. So I'm just trying to figure out what's your evidence that they would have or should have even noticed his feet. They've conceded to the obviousness of it, the fact that the feet were so swollen, the fact that there's other evidence that this man was in a state of serious trouble in terms of the condition of his cell. If believed, there was vomit in the cell. There was feces all over the cell, certainly. This was a man who was in obvious trouble at the time that these men would have looked into that cell. This guy had been messing up his cell for a good part of the 30 days. That's correct, Your Honor. So that doesn't mean that he was all of a sudden in distress. Well, I think when taken and combined with the feet. I'm still hung up on the feet. I mean, I will accept for purposes of our discussion that had they seen his feet, they should have noticed there's something dramatically wrong. I get that. But where is there any evidence that they saw his feet? Or given the way in which they were looking through the slot in his cell, his feet even would have been visible to them. Well, if you look through the slot in the cell, and I can't point to a specific part in the record, but there is testimony in the record about what is observable from where the deputies are looking into the cell. And if you're looking into the cell, you can see the bed and you can see the feet. Now, they're obviously denying that they can't see the feet, that they didn't see it. But again, that comes down to their credibility. We have to assume that when they looked in the cell, like they said they did for breakfast and for the head count, that they did see his feet. And according to the doctor, the feet would have been so large and leaking fluid that therefore they should have done something, right? Right. So what is the evidence upon which we base that assumption that they did see his feet? That they were there and admit that they saw Mr. Peterson. And the medical evidence suggests that if they saw Mr. Peterson, they would have noticed that he was in an acute medical state. The evidence suggests that, in fact, he wasn't breathing at the time that these men saw him. You say that the medical evidence suggests he wasn't breathing even at 5.10? Correct. What's that based on? The expert testimony of Dr. Suna, that he went silent after these, even the neighboring inmates say that the moaning stopped. Well, moaning and breathing are two different things. If he wasn't breathing, he was dead, and it wouldn't have made any difference. Well, no. That doesn't mean he's dead and beyond saving, and that's part of what Dr. Suna says. If you're going to come back, if medical attention had been summoned, either if he wasn't breathing, he could have been revived. It doesn't mean necessarily that he was dead. But didn't he tell the one guard he wanted his breakfast? That's what the guard says. And I would turn to the point. Does the district ignore all this evidence? Does it contradict that? Well, it's self-serving testimony. I think what the district court recently said in Krukko is it's not surprising that people wouldn't admit to seeing this and doing nothing. And I think, again, some of the opposing counsel has attempted to kind of dodge some of the credibility issues here. But the fact of the matter is both of them were convicted, isn't the right word, but cited or written up for not telling the truth about their actions that morning. I want to make sure that you understand that Krukko is a district court decision that contains language in an opinion that came out after it was remanded to the district court because the district court didn't make the individualized inquiry that's the subject here. It comes back up. The panel did not endorse Krukko's language whatsoever. It's simply found because there was a factual dispute there wasn't any jurisdiction. Understood. So Krukko, even if Krukko's language is correct, for which there's really no authority that it's correct, in no way has that been endorsed by the Sixth Circuit. Sure. But I think it also goes back to the court's decision. I mean, we can even look to the Supreme Court's decision in Tolan. And just you have to look at all the evidence, the direct and circumstantial evidence, the mere fact that they didn't admit to seeing it when there is evidence that suggests that there were obvious medical symptoms and that they looked into that cell and could have seen it. The mere fact that they say they didn't, I'm unaware of any case law that says that that's good enough. Were either of them asked specifically about the feet? I'm sorry, Your Honor. Were either of the two defendants here asked specifically about the feet? I recognize they say or their affidavits say, well, I didn't see anything, didn't see any trouble. Were they deposed and asked specifically, you know, did you notice his feet? I can't recall specifically if that precise question was asked. It certainly was asked if they noticed anything wrong with his medical state, which obviously was denied as part of that. If we agree with you in this, what sort of standards would we be setting, if any, about how obvious something needs to be in connection with looking through a cell window and a cell count, for example, that then imposes a duty upon a non-medically trained custodial person to then summon, not only summon medical staff, but summon them immediately because of the degree of distress that it turns out he was actually in? Well, I mean, there are several things that I would say. You know, first of all, the autopsy photos show some pretty severely blistered, bloated feet. And when these deputies can... The blisters on the top or the bottom? The bottom. So how were they to have seen blisters on the bottom of his feet on these two encounters in question in this particular case? I get the fact you think they looked in, therefore, they must have seen his feet, and they must have seen his feet were swollen. They're not going to see the blisters. They're not going to see feet leaking at that point, are they? They very well could have. It depends on how the feet were precisely positioned. But this is your burden. Sure. If you're making that claim, what I'm really asking you is are you saying that they would have seen the blisters and or the leaking, or you're not saying that, or you don't know? Yes, sir. I mean, we're saying that they should have seen that, and they should have noticed that he wasn't responsive. They should have seen what? They should have noticed that the cell is a mess, that his feet are blown up, that the blisters were there. They're just saying that they didn't notice anything wrong. I'm glossing over this. You raised the blisters. I didn't raise this. Sure. You're saying that they also would have and should have seen something, in this case blisters, on the bottom of his feet. Yes. Looking in a cell door, going through on a head count. That's correct, Your Honor. Why? It doesn't even, with all due respect, I'm trying to figure out how that even makes logical sense. Well, one thing that these deputies are trained to do during a head count is to actually, security checks, according to Ohio minimum jail standards, they're supposed to make sure that the inmate is responsive. Now, they're saying that he was responsive, but the medical evidence suggests that he was struggling at this time. So the mere fact that they're saying. . . What's that got to do with the bottom of his feet? Because if they had noticed whether he was responsive or done anything to interact with him, they would have known that. I mean, the evidence from the neighboring inmates suggests that this was. . . Time out. Sure. What you seem to be now saying is had they noticed he was in distress, then they would have gone in, they would have examined him, and then they would have seen the bottom of his feet. That's not the question. What is the basis of saying they would have seen this blistering on the feet? That they looked into the cell and that they should have. . . Were his feet up? Were his feet sticking towards the cell door or were they on the floor of the cell? He was on his bunk, and the answer to that question is we don't know. Well, one guy says he was sitting up with his back against the cell wall, and one jailer believed that he was asleep in that position. Now, that person wouldn't have seen the bottom of his feet, would he? Depending on how the feet were hanging off? I mean, if the feet. . . The bunk is up against the. . . This is complete conjecture whether they would have seen the bottom of his feet, is it not? I mean, we don't know for sure whether they saw the bottom of his feet. I can't prove to you that they saw. . . We've wasted enough time on the bottom of his feet. You say these conditions, this man, existed for a long time. Correct, Your Honor. They probably existed when the nurse saw him the last time. Well, not in the acute state that they would have existed at the time when he was seen, and that's what the district court said, that these symptoms became acute. On the morning, that's what the medical evidence suggests, that on the morning he died was when these symptoms became acute. His feet weren't swollen before then? I mean, they would have been somewhat swollen, yes, because the edema fluid would have built up gradually over the time that he was jailed. And when you have congestive heart failure, your lips turn blue, your fingernails turn blue. Right. And the nurses and doctors never noticed any of that. Well, whether they noticed it or not. . . To whom it should have been obvious is my next question. It should have been obvious to. . . Obvious to whom? I mean, frankly, to all of these people, including the deputies on the morning that he died. That's my answer to that question. With that said, unless the court has any more questions, I'd ask that the district court's denial of qualified immunity to deputies denied or be affirmed. Thank you. Time for rebuttal on this part. He didn't know that he had to go to school. By the way, he said in the second case he ran it 15 minutes. I'm so sorry. I did ask for five. I don't think I used my 15 during my initial presentation. You did. I did? Well, let's give him two minutes on this, and then we'll go to the next case. I can be very quick. I heard a lot of defendants could have. They should have. They may be. They had the opportunity to notice. I didn't hear anything about actual evidence that they did notice. What does the record show in terms of what you can see of an inmate when you look through the window of the cell, either for head count or delivering breakfast? The record says that there's a window that is about a quarter of the size of a door that, depending on the angle you're looking through the window, may not show you the entire cell, may not show you the floor of the cell. It's more than a food slot. Yeah, there's a food slot that's underneath a rectangular window that sort of runs perpendicular to that slot. Is there a picture from outside the door anywhere in the record? There probably is in the IA report where Mr. Peterson's body is found, and there's the video of them approaching the cell that shows the door being opened when they find his body, and that would show the cell pretty well. Well, there's a 45-minute CD that's basically the extraction of what turned out to be a dead person. Right. But it's not focusing on looking through the window, as I recall it correctly. It's not, but I think there is a front view of the window so the court could at least see. But you're not claiming that had somebody put their face up to the window and looked in that they couldn't have seen the floor of the cell or somebody's feet? Depending on the angle, no, I'm not claiming that. Is there any evidence whether they dim the lights at night? No. I'm sorry, the lights stay on. Are people trying to sleep? Yes. Prisoners complain about it a lot. Yes, yes, they don't like it. One thing I'd say is this, to just wrap it up. Mr. Peterson died from an unforeseen event related to an unknown condition. He was seen by a nurse last on September 2nd, just a day and a half before he died, who noted nothing. Nurse Uniqua Bryant, who provided an affidavit. Under these circumstances, the failure to notice something is wrong with an inmate is not deliberate indifference, plain and simple. Thank you. Thank you, counsel. All right, Mr. Edgington's attorney will come up. Thank you, Your Honor. And like the labels, we now have the appellants over here.